UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN R. GARCIA, | ) |
| Plaintiff, | ) |
| | ) No. 08 C 3366 |
| v. | ) |
| | ) Hon. Marvin E. Aspen |
| JOHN E. POTTER, Postmaster General, United States Postal Service, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff John Garcia sued his former employer Defendant United States Postal Service (USPS) for retaliation and national origin, age, and sex discrimination.[1] USPS answered, the parties completed discovery, and Garcia voluntarily dismissed his age and sex discrimination claims. Presently before us is USPS's motion for summary judgment on the remaining claims. For the reasons discussed below, we grant the motion.

I. STATEMENT OF FACTS[2]

Plaintiff John Garcia began working for Defendant USPS in 1987. (Def. Facts ¶ 1.) Beginning in 1990, he served as a full time distribution window clerk in Hazel Crest, Illinois,

---

[1] Garcia argues in his opposition brief that he is also pursuing a race discrimination claim. (Opp'n at 6.) However, he did not allege race discrimination in his complaint, and it is inappropriate for him to raise a new claim at this time.

[2] Unless otherwise noted, the facts described are undisputed. We rely primarily on the parties' Local Rule 56.1 statements of undisputed facts. We have evaluated the objections raised by both parties and present the facts here as appropriate after considering the evidence presented.

1

and in 2001 he became the head distribution window clerk. (Def. Facts ¶ 1; Garcia Dep. at 11.)[3] His job duties included sorting post office box mail, selling stamps, handling certified mail, and working with accountable items, namely stamps and money. (Def. Facts ¶ 1.) At all relevant times, Garcia was the only Mexican-American clerk at the Hazel Crest post office. (*See* Pl. Facts ¶ 1.) USPS suspended Garcia on July 22, 2004 and terminated him on September 12, 2004. (Def. Facts ¶¶ 16, 18.)

Steve Schneider was the postmaster at Hazel Crest from 1996 to 2001, and he was the acting manager of post officer operations, a regional supervisor position in which he oversaw the Hazel Crest office, from May to November of 2004. (Pl. Ex. 1 at 84–85; *see* Def. Facts ¶ 2.) Pat Kavanaugh was the postmaster at Hazel Crest from 2003 to until late 2004. (Pl. Ex. 1 at 116–17.) Jim Fuscaldo was Garcia's direct supervisor at all relevant times. (Def. Facts ¶ 2.) James Gudlowski, a Polish-American, and Vanessa Lewis, an African-American, were clerks at Hazel Crest at the time of Garcia's suspension and termination. (*See* Pl. Ex. 1 at 24; Garcia Dep. at 46–47.)

    A.    Garcia's Termination

A series of regular audits from around November 2002 to April 2004 revealed a cumulative $800 shortage in Hazel Crest's retail stock, and in April 2004 postmaster Kavanaugh reported the shortage to the Postal Inspection Service. (*See* Pl. Ex. 1 at 119–20.) The retail stock at Hazel Crest was open to all clerks, and therefore the shortage was not directly attributable to any particular employee or employees. (Pl. Ex. 1 at 160; *see* Garcia Dep. at 4.) The official form Kavanaugh used to report the shortage required him to list a suspect, and

---

[3] Citations to "Garcia Dep." refer to Garcia's deposition on August 10, 2009.

Kavanaugh listed Garcia. (Pl. Ex. 1 at 121.) Kavanaugh testified that he listed Garcia because shortly before Kavanaugh submitted the form Garcia had been bragging about gambling on the NCAA Tournament, wearing new shoes, and showing off wads of cash. (*Id*. at 121–22.)

The Postal Inspection Service sent Inspector Ramona Parker to investigate the Hazel Crest shortage. (Def. Facts ¶ 6; Pl. Ex. 1 at 154–55) Parker testified that she ignored Kavanaugh's identification of Garcia as a suspect because, from her experience, the "suspect" section of the shortage form is unreliable. (Pl. Ex. 1 at 192–93.) Instead, Parker began her investigation by reviewing sales reports for all window clerks who had conducted sales in the prior month. (Def. Facts ¶ 6.) Parker flagged voided sales, single-stamp sales, and "no-sells"—when cashiers open their cash drawers without making a sale—because these types of transactions are indicators of potential misconduct. (Def. Facts ¶ 6; Pl. Ex. 1 at 156–57.) Parker discovered that Garcia had engaged in a significantly higher percentage of the flagged transactions than other clerks. (Def. Facts ¶ 7.)

Parker decided to install a video surveillance camera over Garcia's work station to monitor his transactions. (*See id.* ¶ 8.) After taping, Parker matched the videotape to receipts of Garcia's transactions and discovered that on May 5, 2004, Garcia engaged in three questionable transactions. (Def. Facts ¶ 10; *see* Def. Ex. 13 ¶¶ 5–7.) First, according to Parker, Garcia sold a customer a $7.40 book of stamps but rang up the sale in the USPS computer system as a $0.37 single stamp. (Def. Facts ¶ 11.) Garcia protests that the video actually shows him selling the customer a $3.70 half-book, however he does not contest that he rang up the sale as one stamp. (*See* Pl. Resp. to Def. Facts ¶ 11.) Second, Garcia sold a customer a single stamp but did not ring up the purchase. (Def. Facts ¶ 12.) Third, Garcia sold a customer a $7.40 book of stamps

3

but rang it up as three single stamps. (*Id.* ¶ 13.) Garcia did not provide receipts to the customers in these transactions. (*Id.* ¶ 13.)[4]

Parker and Inspector Michael Young interviewed Garcia about the video on July 22, 2004. (Def. Facts ¶ 14; Pl. Ex. 1 at 55–56.) According to Parker and Young, Garcia admitted "that he 'probably' does not put all sales into the [computer] system and 'probably' does not enter all transactions correctly." (Def. Ex. 13 ¶ 14; Def. Ex. 14 at 2.) Garcia denies making this statement. (Pl. Ex. 1 at 58.) Parker and Young claim that Garcia refused to view the May 5 videotape; Garcia denies doing so. (Def. Ex. 13 ¶ 12; Def. Ex. 14 at 2; Pl. Ex. 1 at 58–59.)

After the interview with Garcia, Parker presented the results of her investigation to Kavanaugh, and Kavanaugh suspended Garcia later that day, July 22, 2004. (Def. Facts ¶ 16; Pl. Ex. 1 at 185–87.) On August 31, 2004, Kavanaugh interviewed Garcia and reviewed with him the May 5 surveillance video. (Def. Facts ¶ 17.) Garcia could not explain the questionable transactions, and repeatedly answered Kavanaugh's questions by stating, "I did not knowingly put in any wrong transactions." (Def. Facts ¶ 17; *see* Pl. Resp. to Def. Fact ¶ 17.) Kavanaugh proposed Garcia's termination on September 12, 2004, and Schneider, whose approval as regional supervisor was required, concurred. (Def. Facts ¶ 18.) They issued a Removal Notice which stated that Garcia was terminated for "Unacceptable Conduct as Evidenced by Your Failure to Properly Conduct Window Transactions Resulting in Overages to Your Drawer Which Were Never Accounted For." (Def. Facts ¶ 18; Def. Ex. 12.)

On August 19, 2004, after his suspension but before his interview with Kavanaugh,

---

[4] Garcia does not deny conducting the three questionable transactions on May 5, 2004, but simply "denies engaging in deliberate misconduct." (*See* Pl. Resp. to Def. Facts ¶¶ 11–13.) Accordingly, whether deliberate or not, it is undisputed that he engaged in these transactions.

4

Garcia filed a formal EEO complaint alleging discrimination. (Def. Ex. 8.) After a formal administrative hearing in January 2008, the presiding ALJ decided that Garcia failed to prove discrimination, and the agency issued a final decision implementing the judge's decision. (Def. Ex. 6; *see* Pl. Ex. 1.) Garcia appealed to the EEOC, which affirmed. (*See* Def. Ex. 5.) Garcia then filed this case.

   B.  Alleged Discrimination & Retaliation

Garcia alleges that throughout his tenure at USPS, Hazel Crest management—including Schneider but not Kavanaugh—subjected him to name-calling and ethnic slurs. (Pl. Facts ¶ 2; Pl. Ex. 1 at 40.) Garcia does not identify any specific incidents of such conduct. (Pl. Facts ¶ 2; *see* Def. Resp. to Pl. Facts. ¶ 2.) In addition, Garcia outlines the following series of events which he claims are evidence of national origin discrimination.

Sometime in 1996, twelve-hundred dollars was found missing from Garcia's cash drawer. (*See* Pl. Ex. 1 at 20.) After the spare key to his drawer was found loose in the postmaster's desk—a place it should not have been—Garcia was cleared in the investigation. (*See* Pl. Ex. 1 at 20, 90.) Garcia claims that Schneider was the postmaster at the time. (Pl. Ex. 1 at 20.) Schneider, who transferred to Hazel Crest in September of 1996, claims that the incident occurred before he arrived at Hazel Crest. (Pl. Ex. 1 at 90.)

In 1997, a female supervisor complained to postmaster Schneider that Garcia had repeatedly made inappropriate sexual comments to her. (*See* Pl. Ex. 4 at 8–13, 42.) After interviewing the supervisor, Garcia, and other employees, postmaster Schneider issued a Notice of Removal to Garcia for sexual harassment. (Pl. Ex. 4 at 11–12.) Garcia was later reinstated. (Garcia Dep. at 68.)

In 1998, Garcia sought a transfer to Arizona. (Pl. Facts ¶ 11.) Schneider completed an

5

evaluation form in connection with the transfer request. (Pl. Ex. 1 at 96.) Schneider does not recall the exact contents of his evaluation, but testified that it was neither favorable nor unfavorable to Garcia. (Pl. Ex. 1 at 96–97.) Garcia was not granted a transfer. (*See* Pl. Ex. 1 at 51.)

Finally, Garcia claims that "around 2001 or 2002" he was dating an African-American coworker named Carla Hill, and that Kavanaugh sometimes followed Garcia and Hill when they met up for lunch. (Pl. Facts ¶ 14.) Garcia testified: "another part of the reason why I think they're retaliating against me too, because they don't want me going out with a black girl." (Garcia Dep. at 85.)

Garcia also has a history of EEO activity. After being issued a Notice of Removal for alleged sexual harassment in 1997, Garcia filed an EEO discrimination complaint that led to his reinstatement. (Pl. Ex. 4 at 67.) After he was not granted a transfer to Arizona in 1998, Garcia filed an EEO complaint. (*See* Pl. Ex. 4 at 52.) Garcia filed his most recent EEO complaint—other than the present action—on September 13, 2003, after allegedly being pushed by his supervisor Jim Fuscaldo. (Pl. Facts ¶ 16–17; *see* Pl. Ex. 5 at 160–64.) Garcia appears to have filed other EEO complaints, (*see* Garcia Dep. at 71; Pl. Ex. 5 at 159), but he does not refer to these in his filings.

II. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c)(2). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify

6

"those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

III. ANALYSIS

Garcia brings two Title VII claims arising from his 2004 suspension and termination: national origin discrimination and retaliation from protected EEO activity. We address each in turn.

    A.    National Origin Discrimination

Garcia claims that he was suspended and later discharged because of his national origin in violation of Title VII. Garcia may prove this claim under either the direct or indirect method of proof.

        1.    Direct Method

Under the direct method, the plaintiff must offer direct or circumstantial evidence that supports an inference of intentional discrimination. *Paz v. Wauconda Healthcare and Rehab. Centre, LLC*, 464 F.3d 659, 665 (7th Cir. 2006). "The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d

7

662, 671 (7th Cir. 2008) (citing *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006)).

Under the direct method, direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Direct evidence essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Direct evidence is exceedingly rare. *Id.*

More commonly, a plaintiff may succeed under the direct method by presenting circumstantial evidence which provides a "convincing mosaic of discrimination," *Troupe*, 20 F.3d at 737, from which a jury may reasonably infer intentional discrimination, *Volovsek v. Wisconsin Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). A single piece of circumstantial evidence by itself may be sufficient to establish an inference of discrimination, "depending of course on its strength in relation to whatever other evidence is in the case." *Troupe*, 20 F.3d at 736.

To prove his claim under the direct method, Garcia offers one argument supported by two pieces of evidence. He argues that "[t]he affirmative act of the Postal Service in fingering Garcia for a collective shortage is direct evidence of discrimination." (Opp'n at 7.) To support this argument he cites two facts. First, the retail stock at Hazel Crest was open to several employees other than Garcia, implying that others may have been partly or entirely responsible for the $800 shortage. Second, the USPS investigators did not speak with or videotape anyone but Garcia. (Opp'n at 7–8.) From this, Garcia asks us to infer that he was targeted for the collective shortage, presumably because of his national origin (although he does not specifically

8

argue that he was targeted because of his national origin, which is the crux of what he must prove).

Garcia's direct method argument misses the mark in several ways. First, Garcia's claim that he was fingered for the collective shortage is disingenuous. Although he was the only employee videotaped and interviewed by the USPS investigators, he was not the only employee investigated. Inspector Parker began the investigation by examining the transaction reports of every employee who had made sales in the prior month. Garcia had a disproportionately high number of misconduct-indicating transactions—one-stamp sales, voids, and no sales—and based on this transaction rate, Parker homed in on Garcia as the primary suspect to videotape. The videotape caught Garcia engaging in three questionable transactions on a particular day, and Parker, with another investigator, decided to interview Garcia about the tape. The fact that no other employees were videotaped or interviewed, by itself, does not support Garcia's argument that he was "fingered."

Furthermore, even if he was targeted as the sole culprit of a collective shortage, that fact alone cannot prove unlawful discrimination.[5] To the extent he was targeted, the record shows that it was because he had suspiciously high rates of single-stamp sales, voids, and no sales. Garcia offers no credible direct proof that he was targeted because of his national origin and thus cannot make out his claim through the direct method.

---

[5] When making his direct method case, Garcia does not even argue that he was targeted because he is Mexican-American. (*See* Opp'n at 7–8.) He simply claims he was targeted, which is not necessarily unlawful.

9

2. Indirect Method

The indirect method for proving national origin discrimination follows the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Under this method, the plaintiff initially has the burden of establishing the four elements of the prima facie case of discrimination: (1) he is a member of a protected class; (2) he was performing his job duties satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). If the elements are established, discrimination is inferred and the burden of production shifts to the defendant to raise a legitimate, nondiscriminatory reason for the adverse action. *Id.* Once a legitimate reason is offered, the inference of discrimination disappears, and the plaintiff must establish that the offered reason is a pretext for unlawful discrimination. *Id.*

Garcia's claim fails under the indirect method because he does not even attempt to present a prima facie case. (*See* Opp'n at 8–11.) Instead, Garcia argues that because USPS has offered a nondiscriminatory reason for his termination, he is not required to present a prima facie case in order to succeed under the indirect method. In support he cites three Supreme Court cases: *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 511, 113 S. Ct. 2742 (1993); and *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478 (1983). Although each case states that evidentiary presumptions drop out of the case once the defendant has offered a nondiscriminatory reason for an adverse employment action, none states that a plaintiff can prevail on a discrimination claim under the indirect method without presenting a prima facie

case. To the contrary, it is well settled that a plaintiff who fails to make out a prima facie case cannot prevail under the indirect method of proving discrimination. *See, e.g.*, *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357 (7th Cir. 2009); *McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009) ("[O]ur conclusion on the similarly-situated prong is sufficient by itself to uphold . . . summary judgment."); *Winsley v. Cook Cty*, 563 F.3d 598, 605 (7th Cir. 2009) ("[Plaintiff] failed to satisfy the fourth requirement of the *McDonnell Douglas* framework, and summary judgment . . . was appropriate."); *Antonetti*, 563 F.3d at 592 n.6 ("[B]ecause Plaintiffs cannot survive the first step in the *McDonnell Douglas* analysis, we do not need to consider the third.") (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002)).

Even supposing Garcia had made out a prima facie case—which as the following will show is not possible, *see infra* note 8—his claim would fail because he cannot show that USPS's stated reason for his termination was a pretext for unlawful discrimination. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). "[W]hat is at issue is not the wisdom of the employer's decision, but the genuineness of the employer's motives.'" *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 575 (7th Cir. 2003) (quoting *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996)).

USPS claims that it fired Garcia because of job performance. Investigating the $800 shortage, Inspector Parker realized that Garcia had engaged in a disproportionately high number of misconduct-indicating transactions in one month, and further video surveillance captured

11

Garcia mishandling three transactions on May 5, 2004. Postmaster Kavanaugh then suspended and terminated Garcia based on the results of Parker's investigation. Garcia's basic pretext argument is that Parker's investigation was a setup devised by Schneider and Kavanaugh, who really just wanted to get rid of Garcia because he is Mexican-American. In support, Garcia presents a sprawling series of subarguments.

First, Garcia claims that USPS's proffered reason for his termination is factually baseless. (Opp'n at 9.) In making this argument, he claims that USPS never proved that he stole the missing $800 and that Kavanaugh was not required to report the Hazel Crest shortage to the Postal Inspection Service. We fail to see how these statements, if true, undermine USPS's stated reason for terminating Garcia. Whether Garcia was responsible for all, some, or none of the missing $800 stock, Inspector Parker's investigation revealed that Garcia engaged in a disproportionate amount of single-stamp, void, and no sale transactions in one month and resulted in video evidence of three improper transactions on May 5, 2004. These investigation results are undisputed and form the factual basis of USPS's stated reason for Garcia's termination. With regard to whether Kavanaugh was required to report the shortage, Garcia seemingly would have us believe that Kavanaugh strategically reported the shortage knowing that Garcia, a Mexican-American he was trying to set up, would eventually be caught on videotape mishandling transactions during the independent Postal Inspection Service investigation over which Kavanaugh had no control, and that this video evidence would then give Kavanaugh a cover story for Garcia's termination. To make this chain of inferences from the simple fact that Kavanaugh reported a shortage that he may not have been required to report is simply beyond what a reasonable jury could conclude.

Garcia next offers evidence that he believes shows that Schneider's true motivation in approving Garcia's termination was Garcia's national origin. (*Id*.) To prove Schneider's unlawful intent, Garcia points to three so-called memory lapses. First, at the 2008 administrative hearing in this case, Schneider could not recall whether there was an EEO complaint filed after Garcia was terminated for alleged sexual harassment in 1997 despite the fact that a case was filed and in it Schneider gave an affidavit. Second, Garcia claims Schneider had a memory lapse "about $1200 shortage and the key in the postmaster's drawer." (*Id*.) We infer that by this Garcia means that Schneider was mistaken when he testified that the 1996 incident involving $1200 missing from Garcia's drawer occurred before Schneider was transferred to Hazel Crest. Third, Schneider testified that he could not recall the exact contents of the evaluation form he filled out in connection with Garcia's 1998 Arizona transfer request. The first and third statements are uncontested and we take the second statement as true for this motion. Garcia does not explain how these excerpts from Schneider's testimony prove that Schneider acted with discriminatory intent when he approved Garcia's termination, and we fail to see how they prove anything other than that Schneider may have trouble remembering details of specific events from ten years ago. These "memory lapses" are certainly not evidence that Schneider approved Garcia's 2004 termination because Garcia is Mexican-American.

Third, Garcia claims that Kavanaugh had a suspicious interest in Garcia's romantic relationship with an African-American co-worker, Carla Hill. (Opp'n at 9.) Specifically, Garcia claims that Kavanaugh followed them to lunch on certain occasions. Garcia speculates without supporting evidence that Kavanaugh followed them because he disapproved of inter-racial dating. We fail to see how this pure speculation, even if true, proves that Kavanaugh suspended and terminated Garcia because he is Mexican-American.

Fourth, Garcia claims that similarly situated employees with different national origins were treated more favorably than he was. (Opp'n at 9–11.) "A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'" *Bio v. Fed. Exp. Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Relevant factors for determining whether employees are similarly situated "include whether the employees (I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

Garcia presents two possible comparators: James Gudlowski and Vanessa Lewis.[6] Gudlowski is Polish-American and Lewis is African-American; both were window clerks who had access to the accountable stock from which the $800 was found missing.[7] Although Gudlowski and Lewis had similar job descriptions to Garcia and seemingly reported to the same supervisor, they are clearly distinguishable from Garcia in the sense most relevant to this case: both had single-stamp, void, and no sale transaction rates significantly lower than Garcia's and

---

[6] Garcia also seems to offer John Goscieg as a possible comparator. (*See* Opp'n at 10.) Garcia claims that Goscieg was a letter carrier who was issued a Notice of Termination for forging a signature on a registered mail receipt, and that the notice was later revoked. (Pl. Facts ¶ 33.) It is unclear how Garcia believes he is directly comparable to Goscieg in all material respects when Goscieg held a completely different job than Garcia. On this basis alone, Goscieg is not a viable comparator for Garcia.

[7] Garcia claims in his statement of facts that Gudlowski and Lewis had significant shortages in their drawers on various occasions that were never reported to the Postal Inspection Service. (*See* Pl. Facts ¶¶ 26–27.) As support he cites his own deposition testimony, which in turn is based on hearsay rumors he heard from coworkers. (*Id.*; *see* Def. Resp. to Pl. Facts ¶¶ 26–27.) Because hearsay is inadmissible on summary judgment to the same extent it is inadmissible at trial, any rumor Garcia heard about Gudlowski and Lewis having shortages cannot be used to defeat summary judgment. *See Eisenschadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

neither was caught on videotape engaging in improper transactions. According to USPS, Garcia's questionable transaction rates led to Garcia being videotaped, and the videotape combined with the rates led to his suspension and termination. Because Gudlowski and Lewis did not do the very things that USPS claims led to Garcia's termination, they are not comparable to Garcia in all material respects and thus are not viable comparators.[8]

Fifth, and finally, Garcia argues that he was subjected to inappropriate "catcalls" and name-calling relating to his Mexican-American heritage. He testified that Schneider, in particular, engaged in such behavior, but that Kavanaugh did not. (Pl. Ex. 1 at 40.) Garcia does not identify any specific instances of name-calling.

"[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006)). "A remark can raise an inference of discrimination when it 'was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (quoting *Hemsworth*, 476 F.3d at 491); *see also Mlynczak v. Bodman*, 442 F.3d 1050, 1057–58 (7th Cir. 2006) (finding that comments by nondecisionmaker were irrelevant stray remarks).

Kavanaugh—the person who initiated the investigation into the $800 shortage and who made the decisions to suspend and terminate Garcia—was not involved in the offensive name-calling to which Garcia claims to have been subjected. Further, Garcia cannot pinpoint a single

---

[8] Failure to present a viable comparator would have also doomed Garcia's prima facie case, had he bothered to present one.

inappropriate comment, and consequently we cannot determine any comment's calendrical proximity to his suspension and termination. Finally, the catcalls and name-calling noted by Garcia, however distasteful they may have been, have no apparent relation to his suspension or termination. Thus, from the record before use, no reasonable jury could conclude that these remarks are anything other than stray remarks.

The preceding litany of pretext arguments is unavailing. Ultimately, Garcia presents no actual evidence of discrimination. He simply points to a series of unconnected events that occurred over the course of a decade and asks us to find some pattern of discrimination there. However, in the words of Gertrude Stein, "there is no there there." Gertrude Stein, *Everybody's Autobiography* 298 (1937). It is not our job to piece together a coherent argument to defeat USPS's motion; that burden is on Garcia. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cty, Ill.*, 424 F.3d 659, 664 n.2 ("It is not the duty of the district court to scour the record in search of material factual disputes.") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in" the record.)). He has not bothered to present a prima facie case, and even if he had done so, he has presented no evidence from which a reasonable jury could find that USPS's stated reason for his termination was a pretext for discrimination. Accordingly, his national origin discrimination claim fails as a matter of law.

B.    EEO Activity Retaliation

Garcia next argues that he was suspended and terminated in retaliation of his prior EEO activity. Title VII prohibits an employer from retaliating against employees who exercise their rights under the statute. 42 U.S.C. § 2000e-3(a). As with discrimination claims, retaliation can be shown through either the direct or indirect method of proof. *Rogers v. City of Chi.*, 320 F.3d 748 (7th Cir. 2003). Garcia employs both methods.

Under the direct method an employee must show that he engaged in protected activity, that he was subject to an adverse employment action, and that a causal connection exists between the two. *Gates v. Caterpillar*, 513 F.3d 680, 686 (7th Cir. 2008); *Atanus*, 520 F.3d at 671. Like a discrimination claim, the indirect method for proving retaliation uses the *McDonnell-Douglas* framework. First, the plaintiff must establish that (1) he engaged in protected activity, (2) he suffered an adverse employment action, (3) he was meeting job expectations, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. *Phelan v. Cook Cty.*, 463 F.3d 773, 787 (7th Cir. 2006). If the plaintiff establishes the prima facie case, a presumption of retaliation arises, and to rebut the presumption the defendant must offer a legitimate nonretaliatory reason for the adverse employment action. *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1142 (7th Cir. 1997). Once a nonretaliatory reason is offered, the presumption of retaliation disappears and the plaintiff must show that the reason given for the termination is a pretext for unlawful retaliation. *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459 (7th Cir. 1995).

Garcia clearly engaged in protected activity and suffered an adverse employment action. The primary question for his direct method argument is whether there is a causal connection between the two. Garcia offers two pieces of evidence in support of finding a connection. First, Garcia recounts his various EEO claims against Schneider and Fuscaldo, noting that Schneider approved his termination and that Kavanaugh, who proposed the termination, reported to Schneider. (Opp'n at 12.) Essentially, Garcia argues that Schneider—as respondent in prior EEO cases and approver of Garcia's termination—is the necessary link between Garcia's prior EEO activity and his 2004 suspension and termination. While it is true that Schneider was involved in both Garcia's protected activities and adverse employment actions, and thus through

17

Schneider the two are in some sense connected, Schneider's mere involvement in both does not show a *causal* connection between them.

Second, Garcia presents a timing argument. Garcia had filed his most recent EEO complaint on September 13, 2003, about seven months before Kavanaugh reported the $800 shortage in April 2004 and just under a year before Garcia was suspended on July 22, 2004. Garcia claims that the timing of these events is evidence that he was suspended and terminated because he had previously exercised his protected rights.

It is well established that timing alone is typically insufficient to prove retaliation. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506–07 (7th Cir. 2004); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). In this case, even if we assume that the adverse employment action began at the earliest possible time—when Kavanaugh initially reported the shortage in April 2004—there is a seven month gap between Garcia's most recent EEO activity and the adverse action. Seven months does not strike us as particularly suspicious, and it is certainly not suspicious enough to support by itself a finding that USPS acted with retaliatory intent. *See Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) ("[Three months] between the [protected activity] and the firing is not enough, on its own, to create a jury issue on the inference of retaliation.") (citing *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir.2000) (same)); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval between [the protected activity] and [adverse employment action] does not represent that rare case where suspicious timing, without more, will carry the day."). Thus, Garcia cannot prove retaliation through the direct method.

Garcia hardly presents an indirect argument for retaliation, stating simply that we should deny summary judgment for "all the same reasons cited *supra*, pertaining to similarly-situated

employees, i.e., the other window clerks, and all other arguments advanced above." (Opp'n at 12.) We should not need to remind Garcia that, as the Seventh Circuit has often said, "summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). His indirect method retaliation argument is clearly insufficient. However, for the sake of completeness we address it briefly. First, "the . . . reasons cited *supra*"—by which we infer he means his indirect method national origin discrimination argument—failed because Garcia did not present a prima facie case and could not establish that USPS's stated reason for his suspension and termination was a pretext. The same is true for his retaliation claim. Furthermore, nowhere in the record does Garcia identify whether or not the "other window clerks" engaged in EEO activity, and thus we cannot determine whether any is a viable comparator.

Garcia makes no coherent direct or indirect method case for retaliation, and consequently no reasonable jury could conclude that Garcia was suspended and terminated in retaliation of his prior EEO activity.

IV. CONCLUSION

For the reasons stated above, we grant USPS's motion for summary judgment. It is so ordered.

_____
MARVIN E. ASPEN
United States District Judge

Dated: April 1, 2010.

19